**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
——————————————————————————

NETTER THOMAS,

                **Plaintiff,**

      - against -              **09 Civ. 5116(JGK)**

DAVID SAGATIES, et al.,

            **Defendants.**      **MEMORANDUM OPINION AND**
                                       **ORDER**
——————————————————————————

**JOHN G. KOELTL, District Judge:**

    The plaintiff, Netter Thomas, brought this action pursuant
to 42 U.S.C. § 1983 against David Sagaties, Dr. Kamlesh Verma,
Christine Madingo, and Dr. Donald Sawyer, who were employed by
the New York State Office of Mental Health ("OMH") at all
relevant times, and against Bryan Hilton and Patrick Griffin,
who were employed by the New York State Department of
Corrections ("DOCS") at all relevant times (collectively "the
defendants"). She alleges that the defendants terminated her
employment in retaliation for the exercise of her right to free
speech protected under the First and Fourteenth Amendments of
the United States Constitution. The defendants now move for
summary judgment pursuant to Rule 56 of the Federal Rules of
Civil Procedure.

**I.**

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v.Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also White

2

v. Dep't of Corr. Services, No. 08 Civ. 0993, 2011 WL 4527320, at *1 (S.D.N.Y. Sept. 30, 2011).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654 (1962)); see also Gallo, 22 F.3d at 1223.  Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible...."  Ying Jing Gan v. City of N.Y., 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998) (collecting cases); White, 2011 WL 4527320, at *1.


## II.


The following facts are undisputed except where otherwise noted.  In March 2008, the plaintiff began her provisional

employment as a Licensed Master Social Worker ("LMSW") with the
Behavioral Health Unit ("BHU") at Sullivan Correctional Facility
("Sullivan").  (Defendants' 56.1 Statement ("Defs' 56.1") ¶ 1;
Plaintiff's 56.1 Response ("Pl.'s 56.1") ¶ 1).  During the
course of the plaintiff's employment, defendant Hilton served as
Assistant Deputy Superintendant at Sullivan, defendant Verma
served as one of the plaintiff's supervisors, defendant Griffin
served as Deputy for Security at Sullivan, defendant Mandigo
served as Associate Personnel Administrator for the New York
State Office of Mental Health ("OMH"), and defendant Sawyer was
Executive Director of OMH.  (Compl. ¶¶ 3-6).  Defendant Sagaties
was Unit Chief for BHU from June 2008 until March 2011.
(Knudsen Decl. Ex. D ("Sagaties Aff.") ¶ 1).  The BHU is a
jointly-operated program of OMH and the Department of
Correctional Services ("DOCS"), and is designed "to provide
treatment services to inmate-patients with serious mental
illnesses who are actively serving sanctions in a Special
Housing Unit ("SHU")."  (Defs' 56.1 ¶ 2; Pl.'s 56.1 ¶ 2).  BHU
employees, including the plaintiff during her employment, meet
as a treatment team to discuss inmate-patient progress.  (Defs.'
56.1 ¶ 2; Pl.'s 56.1 ¶ 2).  As an LMSW, the plaintiff was
primarily responsible for providing counseling services to BHU's
inmate-patients.  (Compl. ¶ 9; Answer ¶ 6).

4

The defendants claim that beginning in April 2008, Verma began receiving complaints about the plaintiff, and met regularly with the plaintiff to discuss her behavior and job performance. (Defs' 56.1 ¶ 4).  In support of this assertion, the defendants cite memoranda and e-mails that recount alleged incidents of insubordination, disrespect toward co-workers and DOCS staff, and failure to abide by established BHU and DOCS security and conduct policies. (Knudsen Decl. Ex B).  On June 4, 2008, Verma issued a formal counseling to the plaintiff. (Verma Aff. ¶ 9).  A memorandum regarding the counseling, issued to the plaintiff, summarized the plaintiff's alleged behavior issues and various informal counseling meetings. (Knudsen Decl. Ex B at 52-53).  The plaintiff was instructed to abide by her performance standards, which included sustaining appropriate relationships with co-workers and inmate-patients, and was warned that further inappropriate behavior would not be tolerated. Id.  On June 26, 2008, the plaintiff received a second formal counseling, the memorandum of which summarized an instance in which the plaintiff had allegedly left her group of inmate-patients unattended and a second incident where the plaintiff allegedly failed to arrive for her group session. Id. at 48-49.  The plaintiff was advised that she needed to show "immediate improvement" in the area of respecting others. Id.

The plaintiff's probation period report, presented to her on July 25, 2008, reiterated the need for the plaintiff to improve in the areas of "relationship with people," "reaction to supervisor[s]" and "analytical and problem solving abilities." Id. at 2.  On October 4, 2008, Sagaties forwarded to Mandigo a report from Hilton of an incident of the plaintiff's alleged insubordination, and added that with the plaintiff's previous behavior issues and unsuccessful counseling, he believed termination was the appropriate course of action.  Id. at 29. In response, Mandigo sent Sawyer a summary of the plaintiff's alleged misconduct and history of formal counseling, and requested permission to proceed with the termination.  Id. at 19.  On October 8, 2008, Sawyer approved the plaintiff's termination.  Id.  On October 10, 2008, the plaintiff was informed of her termination, which was to take effect eight days later.  (Defs' 56.1 Stmt. ¶ 22; Pl.'s 56.1 Stmt. ¶ 22).

While the plaintiff does not dispute the timeline set forth by the defendants, she alleges a very different version of events.  The plaintiff alleges that she "repeatedly observed and complained to her supervisors and [DOCS staff] about inappropriate, punitive treatment" of inmate-patients, and that she continually notified her supervisors of this ongoing abuse. (Pl.'s 56.1 Stmt. ¶¶ 10, 13).  Specifically, the plaintiff

6

alleges that on May 8, 2008, the plaintiff reported to a Unit Chief at BHU that an African-American inmate-patient was being treated unfairly because of his race. (Knudsen Decl. Ex A ("Thomas Dep.") at 104-08). The plaintiff also raised concerns about officers at Sullivan being racist against African-Americans inmate-patients and staff, including the plaintiff, although the plaintiff later sent an e-mail to a Unit Chief at BHU, stating that the plaintiff "had no issues with the correction officers . . . [nor] with the way in which they have treated [her]." (Knudsen Decl. Ex G ("Stapholz Aff.") at 57). Additionally, during a September 4, 2008, meeting of the treatment team, the plaintiff raised concerns about the disparate, racially-motivated treatment and punishment of inmate-patients, as well as what the plaintiff perceived to be Griffin's unilateral decision making. (Pl.'s 56.1 ¶ 17; Defs' 56.1 ¶ 17). When asked by Sagaties for specific instances of unilateral decision making, the plaintiff did not name any specific incidents, (Knudsen Decl. Ex B at 33-34), although she now contends this was because Sagaties already knew the incidents to which she was referring and also because she feared naming inmate-patients could jeopardize her safety. (Pl.'s 56.1 ¶ 17).

With respect to her alleged behavioral issues, the plaintiff disputes that her meetings with Verma were convened to correct the plaintiff's behavioral issues.  Id. ¶¶ 4-8. Instead, the plaintiff asserts that the meetings focused on the curbing the plaintiff's desire to advocate for the allegedly abused inmate-patients.  Id.  The plaintiff alleges that the various memoranda and e-mails circulated regarding the plaintiff's alleged inappropriate behavior, in addition to the plaintiff's probation period report, were filled with misinformation and "code words" designed to alert Sagaties, Sawyer and others that the plaintiff was attempting to stop inmate-patient abuse. (Pl.'s 56.1 Stmt ¶¶ 19, 28-33).

The plaintiff claims that Hilton and Griffin pressured the plaintiff's supervisors to recommend her for termination, and that Hilton was "trying to cast [the] plaintiff in a negative light."  Id. ¶¶ 14, 26c.  The plaintiff alleges that Mandigo's October 8, 2008, e-mail deliberately misrepresented events that occurred during the plaintiff's employment in an attempt to "railroad" her.  Id. ¶ 26; (Thomas Dep. at 121).  The plaintiff claims that all of the defendants "feared her whistle-blowing activity," such that they felt compelled to "suppress that [activity] and rid the facility of her," by feeding Sawyer

false information in order to cause her termination.  (Pl.'s
56.1 Stmt ¶ 22).

### III.

The plaintiff claims that she was discharged in retaliation
for her complaints about the disparate, racially motivated
treatment of inmate-patients at Sullivan in violation of the
First and Fourteenth Amendments of the United States
Constitution and 42 U.S.C. § 1983.

It is well-established that "a state cannot condition
public employment on a basis that infringes the employee's
constitutionally protected interest in freedom of expression."
Connick v. Myers, 461 U.S. 138, 142 (1983).  In defining the
protection afforded public employee speech, the Supreme Court
has been sensitive to the "public's interest in receiving the
well-informed views of government employees engaging in civic
discussion."  Garcetti v. Ceballos, 547 U.S. 410, 419 (2006).
Yet "while the First Amendment invests public employees with
certain rights, it does not empower them to 'constitutionalize
the employee grievance.'"  Garcetti, 547 U.S. at 420 (quoting
Connick, 461 U.S. at 154).  "Government employers, like private
employers, need a significant degree of control over their

employees' words and actions" in order to provide services to the public efficiently.  Id. at 1958.

Therefore, in order for a public employee to state a claim for First Amendment retaliation, the plaintiff initially must show by a preponderance of the evidence that: (1) the plaintiff spoke "as a citizen upon matters of public concern," Connick, 461 U.S. at 147, rather than as an employee on matters of personal interest, (2) the plaintiff suffered an adverse employment action, and (3) the speech at issue was a substantial or motivating factor in the adverse employment action.  See Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003); Sheppard v. Beerman, 317 F.3d 351, 355 (2d Cir. 2003).

If the public employee successfully states a prima facie case of First Amendment retaliation, the government employer may still prevail by showing by a preponderance of the evidence that it would have taken the same action regardless of the employee's speech. See, e.g., Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Pappas v. Giuliani, 118 F.Supp.2d 433, 443 (S.D.N.Y.2000), aff'd, 290 F.3d 143 (2d Cir.2002); see also Benvenisti v. City of New York, No. 04 Civ. 3166, 2006 WL 2777274, at *7 (S.D.N.Y. Sept. 23, 2006).

The defendants argue that the plaintiff has failed to establish a prima facie case of First Amendment retaliation

because her complaints were made pursuant to her official job duties and not on a matter of public concern.  The defendants further argue under Mt. Healthy that BHU had independent, fully-justified reasons for terminating the plaintiff. For these reasons, the defendants claim they are entitled to summary judgment on the plaintiff's First Amendment retaliation claim.

**A.**

In evaluating a claim of First Amendment retaliation, the threshold question is whether the plaintiff was "speaking as a citizen upon matters of public concern." Connick, 461 U.S. at 147. In Garcetti, the Supreme Court clarified that this question involves two distinct inquiries.  First, the Court must determine whether the plaintiff was speaking as a "citizen" for First Amendment purposes.  See Garcetti, 547 U.S. at 417. Employees do not speak "as citizens for First Amendment purposes" when they "make statements pursuant to their official duties." Id. at 421.  Whether a statement is pursuant to official duties should be determined through an "objective" and "practical" inquiry, because the scope of the employee's duties is not determined by a formal job description.  Weintraub v. Bd. of Educ., 593 F.3d 196, 202 (2d Cir. 2010) (quoting Garcetti,

11

547 U.S. at 424).  Speech need not be "required by, or included in, the employee's job description, or in response to a request by the employer," so long as it is "a means to fulfill, and undertaken in the course of performing," one of the employee's "primary employment responsibilit[ies]." Id. at 203 (internal quotation marks and citations omitted); see also Flyr v. City Univ. of New York, No. 09 Civ. 9159, 2011 WL 1675997, at *3 (S.D.N.Y. Apr. 25, 2011).  After that, the Court must turn to the traditional Connick analysis and ask whether, viewing the record as a whole and based on the content, context, and form of a given statement, the plaintiff's speech was made as a citizen upon "matters of public concern." Connick, 461 U.S. at 147-48. "The inquiry into the protected status of speech is one of law, not fact." Id . at 148 n. 7; see also Benvenisti, 2006 WL 2777274 at *7.

The plaintiff's speech can be grouped into two categories: (1) complaints regarding the treatment of inmate-prisoners by DOCS staff and (2) complaints about the decision making process at BHU.

**1.**

The defendants claim that the plaintiff's complaints of
disparate, racially motivated treatment of inmate-patients were
made pursuant to her official job duties and are therefore
unprotected.  This assertion, however, is in direct conflict
with the evidence offered by the defendants themselves.  In an
e-mail to several BHU employees, Verma stated that the plaintiff
would need time to "undo" the training from her former work,
where she "advocated, advocated, advocated." (Knudsen Decl. Ex
B at 347).  When the plaintiff expressed frustration with her
inability to advocate for inmate-patients, Verma advised the
plaintiff that her goals were unrealistic given the nature of
the inmate-patient population at BHU.  (Defs' 56.1 ¶ 10).  Verma
also wrote in an e-mail to OMH staff that BHU might not be a
"proper environment" for the plaintiff, and that he had
suggested to the plaintiff that she change some of her advocacy
goals and make them more realistic to BHU and the forensic
environment.  (Knudsen Decl. Ex B at 360).  At the very least,
this raises issues of material fact as to whether complaints
regarding racially motivated disparity in inmate-patient
treatment were "[meant] to fulfill, and [were] undertaken in the
course of performing" one of the plaintiff's primary employment

13

responsibilities.  Weintraub 593 F.3d at 203.  While the ultimate determination under Garcetti is a question of law for the Court, such a factual issue precludes a legal determination at the summary judgment stage.  See, e.g., Caruso v. Massapequa Union Free Sch. Dist., 478 F. Supp. 2d 377, 384 (E.D.N.Y. 2007)(issues of fact regarding an employee's job responsibilities preclude Garcetti analysis.)

## 2.

The plaintiff also complained about what she perceived to be Griffin's unilateral decision making during treatment meetings.  This speech, unlike the plaintiff's allegations of racially-motivated treatment disparity, was unquestionably made as an employee and not a citizen.  The plaintiff was addressing a concern that Griffin was ignoring her professional opinion, as well as those of her colleagues, to the detriment of inmate-patient treatment.  This speech was clearly in furtherance of the plaintiff's professional responsibilities and "undertaken in the course of performing" her duties as an LMSW.  Weintraub, 593 F.3d at 203.  Accordingly, the defendants' motion is granted as to comments regarding BHU's decision making process.

## B.

The defendants also claim that the plaintiff has failed to show that her speech was on a matter of public concern. An issue is one of "public concern" when it can be "fairly considered as relating to any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146.  A wide range of issues have been found to constitute matters of public concern. See Benvenisti, 2006 WL 2777274, at * 10 (collecting cases). Essential to this evaluation is "whether the employee's speech was calculated to redress personal grievances or whether it had a broader public purpose." Ruotolo v. City of New York, 514 F.3d 184, 189 (2d Cir. 2008) (internal quotation marks and citation omitted).  "[S]peech on a purely private matter. . .falls outside the realm of constitutional protection." Schlesinger v. N.Y.C. Transit Auth., No. 00 Civ. 4759, 2001 WL 62868, at *5 (S.D.N.Y. Jan. 24, 2001) (internal quotation marks and citation omitted); see also Benvenisti 2006 WL 2777274, at *10.

Because the plaintiff was not speaking as a citizen when complaining about BHU's decision making, it is unnecessary to determine whether these statements were on a matter of public

15

concern.  With respect to the statements regarding racially-
motivated treatment of inmate-patients, the defendants do not
assert that the plaintiff was attempting to redress personal
grievances, but instead characterize the plaintiff's speech as
largely consisting of complaints about taking away privileges
and therefore not of public concern.  This characterization,
however, is misleading.  While it is true that the plaintiff
complained about certain inmate-patients having privileges
revoked, her primary concern was her perception that racial bias
motivated those and many other decisions regarding the treatment
of inmate-patients at Sullivan.  See (Knudsen Decl. Ex B at 61).
The plaintiff also complained about racism by DOCS personnel
against African American individuals, including inmates and the
staff.  See (Stapholz Aff. at 61).  While she initially included
herself as adversely affected by this alleged discrimination,
she made clear subsequently that her allegations of racial
discrimination were not based on any mistreatment she personally
experienced.  Id. at 57.  Moreover, the Supreme Court has found
complaints of racial discrimination not tied to a personal
employment grievance to be "a matter inherently of public
concern," even when such complaints are made privately to a
supervisor.  See Connick v. Myers, 461 U.S. 138, 146, 148 n.8
(1983)(citing Givhan v. W. Line Consol. Sch. Dist., 439 U.S.

16

410, 415-16 (1979)).  Accordingly, the plaintiff's speech regarding disparate, racially motivated treatment of inmate-patients at Sullivan was speech on a matter of public concern.

## c.

The defendants claim that the plaintiff has failed to show a causal connection between her speech and her termination, and that even if she could show such a connection, her termination was justified on the independent grounds that she was insubordinate and disrespectful.

A plaintiff can establish proof of causation either directly or indirectly.  See Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000).  Causation may be proved indirectly "by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence."  Id.; see also Benvenisti, 2006 WL 2777274, at * 12.  If a plaintiff establishes causation, a public employer and its agents may avoid liability by proving by a preponderance of the evidence that they would have made the adverse employment decision even in the absence of the protected conduct. Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle, 429

U.S. 274, 287 (1977); see also Scheiner v. New York City Health & Hospitals, 152 F. Supp. 2d 487, 495 (S.D.N.Y. 2001).

The plaintiff alleges that she was terminated because of her constant advocacy on behalf of the inmate-patients at Sullivan.  In support of this contention, the plaintiff points to the e-mail in which Verma states that Sullivan may not be the right environment for the plaintiff in the context of a memo in which Verma recounts a conversation with the plaintiff about changing her advocacy goals.  (Knudsen Decl. Ex B at 360).  In response, the defendants allege that the evidence adduces only two instances in which the plaintiff made specific complaints of abuse, first that an African-American inmate-patient was unfairly punished after an altercation, and second that decisions by the treatment team were racially motivated.  The defendants claim that two complaints could hardly be characterized as constant advocacy.  However, in her deposition, the plaintiff highlights several specific incidents of alleged inmate-patient abuse, and recounts her alleged efforts to bring these incidents to the attention of her supervisors.  (Thomas Dep. at 63-69).

The plaintiff also asserts that absent her speech, the defendants lacked sufficient justification for her termination. To support this, the plaintiff points to her probation

evaluation report, which found the plaintiff to be satisfactory in five of eight performance areas, including "quality of work," "work habits, work interest" "resourcefulness," and "written and oral presentation." (Knudsen Decl. Ex B at 1-2).

While the probation report refers to the plaintiff's two formal counselings, both of which highlight the plaintiff's need to improve her relationship with staff and supervisors, the plaintiff claims that the substance of the allegations made in those counselings is false. She asserts that the incidents of her alleged insubordination and unprofessional conduct were fabricated and misrepresented in order to create a pretext for her termination. As to several of the instances of the plaintiff's alleged misconduct, the plaintiff offers versions of events that are sufficiently plausible and materially different than those offered by the defendants. For example, the defendants claim that during a group therapy session, the plaintiff's actions caused five inmate-patients to request to return to their cells. The plaintiff alleges, however, that only three inmate-patients were present at the therapy session, casting doubt on the defendants' allegations. (Thomas Dep. at 109-10). Because the parties offer several competing versions of events, bolstered only by after the fact accounts, there are issues of fact as to what actually occurred in the incidents and

19

whether they were pretexts for termination.  In addition, because there are issues of fact as to the nature and severity of the incidents on which the defendants allegedly relied to terminate the plaintiff, the defendants have failed adequately to show that the plaintiff would have been terminated in the absence of her speech.

### D.

Because material facts exist as to both the plaintiff's statements regarding the disparate, racially motivated treatment of inmate-patients, and the causal connection between those statements and her termination, and because the statements of racially motivated treatment were on a matter of public concern, the defendants' motion for summary judgment is denied as to those statements.

### IV.

The defendants argue that the plaintiff has failed to allege personal involvement on the part of defendants Hilton and Griffin. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations

is a prerequisite to an award of damages under § 1983." Farrel
v. Burke, 449 F.3d 470, 484 (2d Cir. 2006)(citation omitted).
Where the defendant is a supervisor, at a minimum, "liability in
a § 1983 action depends on a showing of some personal
responsibility, and cannot rest on respondeat superior."
Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003); see also
Ashcroft v. Iqbal, 129 S.Ct. 1937, 1948 (2008); Solar v.
Annetts, 707 F.Supp.2d 437, 441 (S.D.N.Y. 2010).  Beyond direct
action by the state official, there is considerable disagreement
in the Second Circuit as to how a plaintiff may sufficiently
demonstrate personal involvement of a supervisor. See
Morrissette v. Cripps, No. 10 Civ. 8795, 2011 WL 4089960, at * 2
(S.D.N.Y. Sept. 14, 2011)(collecting cases). However, for the
purposes of this motion, it is unnecessary to explore the outer
reaches of supervisory liability. See Schoon v. Berlin, No. 07
Civ. 2900, 2011 WL 1085274, at *4 (S.D.N.Y. Mar.23, 2011)  The
plaintiff has pleaded facts sufficient to allege Hilton's
personal involvment in the plaintiff's termination and has
failed adequately to plead facts alleging Griffin's involvement
in or knowledge of the plaintiff's termination or discipline.

    In her complaint, the plaintiff alleges that, in order to
affect the plaintiff's termination, Hilton falsely accused the
plaintiff of repeatedly using profanity while criticizing a

supervisor.   (Complaint ¶¶ 15-17).   Hilton's e-mail to Sagaties recounts an alleged conversation between the plaintiff and "a number of OMH and DOCS staff."   During the discussion, the plaintiff allegedly engaged in a profanity-laden tirade, disparaging Sagaties's actions regarding a decision about an inmate-patient's treatment, and making a vow to "do something about it."   In the e-mail, Hilton does not provide the names of any staff member present for the conversation, nor was Hilton present for the conversation himself.   The record reflects that Hilton's e-mail to Sagaties regarding the plaintiff's alleged criticism of Sagaties was the direct cause of Sagaties's recommendation to Mandigo that the plaintiff be terminated. (Knudsen Decl. Ex B at 28-29).   In fact, within one day of receiving Hilton's forwarded e-mail, Mandigo requested permission to terminate the plaintiff and received authorization the next day.   Therefore, a reasonable jury could find that Hilton had personal involvement in the plaintiff's termination. Accordingly, the motion for summary judgment is denied as to Hilton.

C.


The plaintiff alleges that Griffin supported Hilton's efforts and induced the plaintiff's supervisors to terminate her.  The plaintiff does not allege any specific acts by Griffin in her complaint, and the record is devoid of any evidence which shows a connection between Griffin and the plaintiff's termination or disciplinary actions.  Griffin is not alleged to be the source of any false reports of the plaintiff's misconduct, nor did he take part in any communication regarding the plaintiff's disciplinary actions.  Moreover, the record does not reflect that Griffin was even aware of the plaintiff's disciplinary problems or that the other defendants sought permission to terminate her.  At the argument of the current motion, the plaintiff was unable to proffer any evidence of defendant Griffin's personal involvement in the plaintiff's termination.  Therefore, the plaintiff has failed adequately to show any involvement by Griffin.  Accordingly, the defendants' motion for summary judgment is granted as to defendant Griffin.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit.  The motion for summary judgment is **granted** as to the plaintiff's statements regarding decision making at BHU and as to defendant Griffin.  As to all other claims, the motion for summary judgment is **denied**.  The Clerk is directed to close **Docket No. 23**.

**SO ORDERED.**

**Dated:**     **New York, New York**
          **November 22, 2011**

                                        **John G. Koeltl**
                              **United States District Judge**

24